UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARK A. DANIELS, | ) | |
| | ) | |
| Plaintiff, | ) | 12 C 9317 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On April 20, 2007, Mark Daniels filed a claim for disability insurance benefits ("DIB")

with the Social Security Administration, alleging that he had become disabled due to a back

injury. Doc. 9-6 at 5. The Commissioner denied the claim, Doc. 9-4 at 2, and then denied

Daniels's request for reconsideration, *id*. at 3. Daniels sought and received a hearing before an

administrative law judge ("ALJ") pursuant to 20 C.F.R. § 404.914. Doc. 9-3 at 24. The ALJ

denied the claim, *id*. at 11-18, and the Social Security Appeals Council denied Daniels's request

for review of the ALJ's decision, *id*. at 2, making the ALJ's decision the final decision of the

Commissioner. *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). Daniels sought

judicial review pursuant to 42 U.S.C. § 405(g). *Daniels v. Astrue*, No. 10 C 5820 (N.D. Ill. filed

Sept. 14, 2010). The district court remanded the case to the Commissioner for further

proceedings. 2011 WL 3439269 (N.D. Ill. Aug. 4, 2011).

A new hearing was held on remand before a different ALJ. Doc. 9-10 at 38. The ALJ

denied Daniels's claim, *id*. at 20-31, and Daniels timely filed this action under 42 U.S.C.

§ 405(g) seeking judicial review of the Commissioner's final decision. Doc. 1; *see* Doc. 9-10 at

18 ("[i]f [the claimant] do[es] not file written exceptions and the Appeals Council does not

review [the] decision on its own, [the] decision will become final on the 61st day following the date of [the] notice"). For the following reasons, the case is remanded to the Commissioner for further proceedings.

**Background**

The following facts are taken from the administrative record.

**A.  Factual Background**

Daniels was born on November 16, 1958, has a high school education, and speaks English. Doc. 9-10 at 44. He has held jobs as a warehouse forklift operator, locomotive part assembler, and landscaper. Doc. 9-3 at 33-34. He had back surgery in 1988 to repair two cracked vertebrae. Doc. 9-9 at 94. On February 12, 2007, while employed as a laborer assembling train parts, Daniels injured his back lifting a seventy-pound box. Doc. 9-3 at 33.

After his injury, Daniels stayed home from work because he had difficulty moving his back and experienced numbness and tingling in his back and left buttock. Doc. 9-8 at 58. His primary care physician, Dr. Arti Chawla, conducted an MRI scan on February 23, 2007 that revealed "[s]ubtle disc space herniation, left L4-5, with foraminal narrowing." *Id*. at 49, 69. Dr. Chawla referred Daniels to the Joliet Pain Clinic for treatment with Aubrey Linder, a physician's assistant. *Id*. at 57. On March 6, 2007, Linder prescribed a short dose of steroids and a muscle relaxer and advised Daniels to "stay off work for two weeks until [his] follow-up appointment." *Id*. at 76. Daniels reported improvement in his pain levels when he returned on March 22, 2007, and Linder noted he had "mild lower lumbosacral back pain with occasional tingling in that area" and some weakness in his lower left leg. *Id*. at 77. Linder released Daniels to go back to work full-time on April 2, 2007. *Ibid*.

A few weeks after returning to work, Daniels could no longer perform his job duties due to numbness in his legs and significant pain. Doc. 9-10 at 22. He has not worked since then, and he contends that he is disabled because of his back injury and depression.

With respect to his depression, Daniels underwent an initial psychiatric evaluation with Dr. Susan Sherman on June 7, 2007 and was diagnosed with "anxious, irritable, major depressive disorder." Doc. 9-8 at 95. He was assigned a Global Assessment of Functioning ("GAF") score of 60, which indicates a moderate impairment in social or occupational functioning. *Id.* at 96; *see Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. text revision 2000). Dr. Sherman prescribed Effexor, a depression medication, and continued to treat Daniels for a year. Doc. 9-9 at 37-39. On June 22, 2007, Dr. Sherman noted that Daniels was "feeling better on 75 mg Effexor, less anxious and irritable, yelling less at his family, getting out a little more." *Id.* at 39. She observed in September and October 2007 that Daniels was "tired of having to stay around the house because of [his] back pain and inability to drive" and that he was "still agitated a lot, though better on Effexor." *Id.* at 38. On November 7, 2007 and December 10, 2007, Dr. Sherman indicated that Daniels's "major depression disorder [was] in remission" but recommended that he continue taking his depression medication. *Id.* at 37. On February 25, 2008, Dr. Sherman found that Daniels's major depression disorder was "in partial remission" and noted that Daniels claimed he was "feeling ok, not depressed but bored." *Id.* at 132.

On July 2, 2007, Daniels began treatment for his back pain with neurologist Dr. George DePhillips. Doc. 9-8 at 97. Dr. DePhillips observed that Daniels's February 2007 MRI scan "reveal[ed] severe disc degeneration with disc space collapse and narrowing at the L5-S1 level" and "mild to moderate disc degeneration at the L3-L4 level as well as the L4-L5 level." *Ibid.*

He believed that the pain in Daniels's back was related to disc injury at the L5-S1 level and recommended a caudal epidural steroid injection and that Daniels remain off work. *Id*. at 97-98.

On August 7, 2007, Daniels underwent another MRI scan conducted by Dr. Joseph Hindo, which revealed "[m]ild to moderate degenerative changes of the lumbar spine" and "overall … similar [findings] to the previous MRI of 2/2007." Doc. 9-9 at 11, 76. On September 26, 2007, Daniels returned to Dr. DePhillips for a follow-up evaluation. *Id*. at 46. Daniels reported that he experienced minimal pain relief after the first caudal epidural steroid injection and that he continued to experience lower back pain radiating into the hips and buttocks. *Ibid*. Prior to his back injury, Daniels rated his back pain at a two to three out of ten, with ten being the most painful; at the time of his appointment with Dr. DePhillips, Daniels rated his pain at an eight out of ten. *Ibid*. Dr. DePhillips scheduled another caudal epidural steroid injection and prescribed pain medication. *Ibid*. He told Daniels to "remain off work at this point in time" and gave him a "disability certificate until his next appointment." *Ibid*.

On October 29, 2007, Dr. DePhillips saw Daniels for a follow-up appointment. *Id*. at 45. Four days earlier, Daniels had a third caudal epidural steroid injection, which according to Dr. DePhillips provided "no real relief." *Id*. at 46. Dr. DePhillips recommended that Daniels begin physical therapy three times per week for three weeks. *Id*. at 45. Dr. DePhillips noted that Daniels was scheduled for an independent medical evaluation with neurologist Dr. John Shea at Loyola University Medical Center and planned to review Dr. Shea's evaluation as well as Daniels's response to physical therapy at the next appointment. *Ibid*.

On October 31, 2007, Dr. Shea examined Daniels. *Ibid*. Dr. Shea reported that Daniels "has pain in his low back" and "loss of strength in the left leg," and that spinal injections and chiropractic treatment "didn't help," though "[Daniels] has tried seven different pain medications

which have given him some help." *Id*. at 94.  Dr. Shea added that Daniels "can't walk very far" and that "[s]itting for more than 25 minutes and standing bother him." *Ibid*.  That day, Daniels rated his pain at a six out of ten. *Ibid*.  Dr. Shea concluded:

> Indeed, the patient could have suffered a back strain related to the work incident he described.  I do not feel it caused any permanent neurological deficits.  In essence, when I saw this patient he had loss of sensation to pinprick and vibration on the entire left side of the body which would be unrelated to any disc in the neck or the low back.  He has normal reflexes with give-way weakness.  He has no atrophy.  I did not find any objective abnormalities.  I do not believe he will need surgery. … As far as his back is concerned, I do not feel he needs any further treatment.  As far as his ability to undergo gainful employment, I recommend a Functional Capacities Evaluation (FCE)."

*Id*. at 96.

On February 6, 2008, Daniels saw Dr. DePhillips for a follow-up evaluation. *Id*. at 89.

Daniels "continue[d] to complain of lower back pain with pain radiating into both lower extremities," and Dr. DePhillips noted that Daniels "has failed to improve with conservative treatment." *Ibid*.  Dr. DePhillips reviewed Dr. Shea's report, and made the following remarks:

> [Daniels] saw Dr. John Shea who felt that his symptoms were related to a lumbar sprain and that he requires no further medical treatment and certainly not surgical intervention.  He felt that Mr. Daniels has reached maximum medical improvement.  In light of the fact that Mr. Daniels has a history of a fusion at the L5-S1 level which appears to have been aggravated by the injury and in light of the fact that there may be other levels of internal disc disruption L3-L4 and L4-L5, it seems ludicrous to attribute his pain to a muscle sprain which should have improved within 2-3 months of the accident.

*Ibid*.  Dr. DePhillips recommended "lumbar discography to pinpoint the source of [Daniels's] pain and to confirm that he has discogenic pain and mechanical instability that is the cause of his pain and that a stabilization procedure is a reasonable option." *Ibid*.  He stated that Daniels was to remain off work until further evaluation. *Id*. at 106.

At the next appointment with Dr. DePhillips on April 7, 2008, Daniels "continue[d] to complain of lower back pain which has worsened over the past few weeks." *Id*. at 88. Dr. DePhillips prescribed two new pain medications and ordered a lumbar discogram, explaining that "[p]rior to agreeing [with Dr. Shea] that this is a lumbar sprain[,] [he] would like to have a discogram to rule out discogenic pain." *Ibid*.

Dr. DePhillips saw Daniels again on June 4, 2008, and observed that Daniels's "pain has progressively worsened since his last visit despite the medications." *Id*. at 86. At the next appointment on July 2, 2008, Dr. DePhillips noted that he "could not obtain a report of the discogram procedure" and that "therefore we have scheduled an appointment … for a second surgical opinion." *Id*. at 84. On August 19, 2008, Dr. DePhillips noted that Daniels "continue[d] to suffer worsening pain in the lower back radiating into both lower extremities" and ordered a MRI scan on September 8, 2008. *Id*. at 82.

On September 15, 2008, Daniels saw Dr. DePhillips for another appointment. *Id*. at 79. Dr. DePhillips observed that the MRI scan "revealed degenerative disc disease from L2-S1, primarily L3-L4 and L5-S1 levels," and that "[t]here [was] no significant change compared to the previous study [referring to the February 2007 MRI]." *Ibid*. That day, Dr. DePhillips wrote to Dr. Cary Templin referring Daniels for a "second opinion to obtain [Dr. Templin's] recommendations regarding a need for a multiple level spinal fusion potentially L2-S1." *Id*. at 80. Dr. DePhillips explained to Dr. Templin that "Daniels has failed conservative treatment thus far" and that they were "considering surgery." *Ibid*. Dr. DePhillips ultimately obtained a second opinion from Dr. Hurley, not Dr. Templin, on October 25, 2008. *Id*. at 78. Dr. Hurley did "not believe that a 4 level fusion L2-S1 would be beneficial if he feels the risks of surgery outweigh the benefits in that he does not believe that surgery would relieve [Daniels's] symptoms." *Ibid*.

Dr. Hurley "encouraged [Daniels] to consider other treatment modalities for the pain and possible spinal cord stimulator." Doc. 9-15 at 78.

During an appointment on October 29, 2008, Dr. DePhillips explained to Daniels that "at this point, [Dr. DePhillips] did not feel comfortable proceeding with surgery unless another independent spine surgeon agreed that it is reasonable to proceed," though "[i]t remain[ed] [Dr. DePhillips's] opinion … that it is reasonable to proceed with a spinal fusion L2-S1 provided that Mr. Daniels has a reasonable expectation in terms of outcome and that there is a 50% chance that his symptoms will not improve or even worsen after the surgery." Doc. 9-9 at 78. Dr. DePhillips added that it was his opinion that "Daniels remains unemployable and disabled." *Ibid*.

On February 19, 2008, Dr. Barry Free, a state agency reviewing physician, opined that Daniels could lift and/or carry twenty pounds occasionally and ten pounds frequently, and that Daniels could stand and/or walk, as well as sit, for six hours in an eight-hour workday with normal breaks. *Id*. at 49. Dr. Free also opined that Daniels could frequently balance, kneel, and crouch; occasionally climb ramps/stairs, stoop, and crawl; and never climb ladders/ropes/scaffolds. *Id*. at 50. In making these findings, Dr. Free referenced only the February 2007 MRI scan, Dr. Chawla's February 2007 notes, and progress reports at the Joliet Pain Care Center from March to April 2007. *Id*. at 55.

On March 12, 2009, Daniels saw Dr. Alex Ghanayem, a spine surgeon. *Id*. at 135. After reviewing Daniels's MRI scans, discograms, and radiographs, Dr. Ghanayem stated: "My impression is that Mr. Daniels is not a good candidate for additional surgical intervention despite his discography results. I think he should see one of our chronic pain/comprehensive pain programs such as the ones offered by RJC or MarianJoy. Hopefully they can help him manage

his residual ongoing symptoms and maximize his potential since his work injury. He should remain off work in the interim." *Ibid*.

Upon discontinuing treatment with Dr. DePhillips due to lack of workers' compensation coverage, Doc. 9-10 at 65, Daniels saw Dr. Matthew Ross in 2010 and 2011. Doc. 9-15 at 142-43. Dr. Ross recommended a discogram "in an effort to try to identify a potentially fixable cause for his pain." *Id*. at 142. The discogram "demonstrated pain at every level tested," which "indicated [to Dr. Ross] that surgical fusion would not be likely to help Mr. Daniels." *Ibid*. Dr. Ross believed that Daniels "would be an appropriate candidate for a spinal cord stimulator trial," but the treatment ultimately provided "only minimal relief." *Ibid*. On December 29, 2011, Dr. Ross observed that Daniels "continue[d] to experience persisting low back pain with radiation into his legs" and would "require long-term medication therapy for this problem." *Id*. at 142-43.

On May 14, 2012, Daniels underwent a Functional Capacity Evaluation. *Id*. at 120. The report stated that "a full duty return to work is not recommended at this time" and that Daniels "demonstrated occasional lifting and frequent lifting/carrying tolerance … at the sedentary physical demand level." *Id*. at 122. That level allows for occasional lifting and carrying of ten pounds, and occasional stooping, reaching, climbing of stairs, squatting, kneeling, overhead work, and shoulder level work. *Ibid*. The report made the following observations as to Daniels's "present activity tolerance": "sitting (approximately 15 minutes, then constantly has to move and adjust secondary to increased low back pain and increased numbness of calves/feet), standing (approximately 15 minutes then needs to keep moving otherwise increased numbness/tingling), walking (approximately 15 minutes then gets increased numbness/tingling and tired), lifting and carrying (25 lbs. most attempted since injury, but hurts) …." *Id*. at 125.

**B.      The Administrative Hearing**

At the administrative hearing before the ALJ on August 1, 2012, Daniels testified that after his February 2007 back injury, he experienced "[c]onstant pain" rated at an eight out of ten (ten being the worst) and "numbness throughout [his] legs … [and] buttocks." Doc. 9-10 at 51. Daniels testified that was "always uncomfortable," had trouble sleeping, and needed to lay in fetal position in order to fall asleep. *Ibid*. He felt that his pain medication in 2007 provided no relief and that the epidural steroid injections helped only "for maybe one or two days." *Ibid*.

Regarding his depression, Daniels testified that he "just did not want to leave the house" or socialize, and that "[e]very time [he] had to leave the house to go to a doctor [he] was always anxious." *Id*. at 52. Daniels testified that he sustained DUI charges in 2001 and 2008, that his driver's license had been revoked since 2001, and that he could drive only with a temporary permit to and from work and Alcoholics Anonymous meetings. *Id*. at 44, 47. Daniels's wife and sons took care of the chores around the house, and Daniels helped only with laundry, though he did not fold clothes. *Id*. at 55. Daniels explained that he had irritability issues and would often direct his anger at family members. *Id*. at 57. He testified that he had had verbal confrontations with coworkers, but was never fired or disciplined for his behavior. *Id*. at 58. When asked whether his "depression is better now today than it was back then [in 2007]," Daniels responded that "[i]t's better" and that he began to notice improvement "after a year" of seeing Dr. Sherman. *Id*. at 53.

Daniels testified that his back was worse at the time of the 2012 hearing than it was in 2007 due to "sharper pains." *Ibid*. Regarding his abilities in 2007, Daniels stated that he could have lifted ten pounds, stood for twenty minutes, walked a mile, and remained seated for fifteen to twenty minutes before experiencing discomfort. *Id*. at 54-55. When asked whether he thought

he would have done better or worse than his 2012 Functional Capacity Evaluation if he had been evaluated in 2007, Daniels stated, "I think it would have been about the same." *Id*. at 64. Daniels estimated that he has spent two-thirds of the day in bed since his injury. *Id*. at 55. He has typically spent the remaining third of the day letting his dogs out, walking around "to take the stiffness out of [his] back," watching television, and listening to music. *Ibid*. Daniels described himself as a "hermit" whose "only comfort zone was being in the house," and he estimated that he walked down the stairs from his bedroom only five or six times a day because doing so hurt his back. *Id*. at 52, 55. Two or three times during the fishing season, Daniels would go fishing with his son for thirty to forty-five minutes at a pond by his house. *Id*. at 56. He never got into a boat and fished only from the shore. *Ibid*. Daniels added that once a week from 2007 to 2008, he and a neighbor would drive two miles to the woods and "sit out there [with his dog] and go by the little stream" for an hour to ninety minutes. *Id*. at 61, 66. When asked why he was missing the tip of his ring finger, Daniels explained that around 2010, while in his garage greasing his motorcycle chain, he accidentally kicked the motorcycle in gear and got his finger caught in the spokes. *Id*. at 67.

　　The vocational expert ("VE"), Ed Pagella, testified about Daniels's previous work and his prospects for other employment in the Chicago metropolitan area. *Id*. at 69-77. VE testimony helps to determine "whether [the claimant's] work skills can be used in other work and the specific occupations in which they can be used …." 20 C.F.R. § 404.1566(e). At a hearing, a VE may "respon[d] to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy." *Id*. § 404.1560(b)(2).

The VE opined that Daniels's work as a laborer was unskilled with a very heavy level of exertion, and that his previous work as a warehouse forklift operator was at the "very low end of semiskilled" performed at a heavy level of exertion. Doc. 9-10 at 69. The VE was asked a series of hypothetical questions regarding employment prospects for hypothetical individuals. The ALJ asked what sort of and how many jobs an individual of Daniels's age, education, and work experience might find if he were limited to full time work at the "light exertional level" and could only occasionally climb stairs, stoop, crawl, or kneel, if he could never climb ladders, ropes, or scaffolding, and if he were restricted to work involving simple instructions and routine tasks, with only occasional interaction with the public. *Id*. at 69-70. The VE estimated that there would be 4,700 hand packer positions, 5,600 assembly positions, and 1,800 hand sorter positions in the metropolitan area. *Id*. at 70. The ALJ then adjusted the hypothetical to restrict the employee to sedentary work, which would require sitting six out of eight hours in a work day, with the remaining time spent standing, walking, and occasionally lifting and carrying up to ten pounds. *Id*. at 70-71. With the new limitation, the VE excluded the hand packer and general assembly positions, and reduced the hand sorter positions to 1,400. *Id*. at 71. The VE estimated that there would also be 3,200 bench assembly positions and 4,300 bench packager positions within the metropolitan area that are entirely sedentary. *Ibid*. Next, the ALJ asked how the answer would change if a sit/stand option were added to the hypothetical, assuming that the employee was on task the entire time. *Ibid*. The VE stated that there would be no change for either the light or sedentary level of physical tolerance even if the sit/stand option allowed for more frequent breaks, such as allowing an employee to alternate positions for five minutes every thirty minutes. *Ibid*. However, the VE opined that there would be no work available if the employee was off task thirty percent of the time. *Id*. at 72. He estimated that there also would

be no work available if the employee had to lay down twice a day for an hour or had to miss

work for mental or physical problems three days per month. *Ibid*.

Daniels's counsel asked the VE how much off-task work employers could tolerate, to

which the VE responded that anything greater than fifteen percent would result in

unemployment. *Id*. at 75. When asked whether the listed positions could tolerate any amount of

lying down on the job, the VE opined that lying down would be permitted only during breaks but

not when the employee should be working. *Ibid*. The VE also noted that none of his responses

would change if the hypothetical called for no contact with the public and occasional interaction

with coworkers. *Id*. at 76.

### C.    The Commissioner's Decision

On August 23, 2012, the ALJ issued a decision finding that Daniels was not disabled and

therefore that he was ineligible for DIB. Doc. 9-10 at 17-31. Because Daniels had acquired

sufficient Social Security coverage to remain insured through December 31, 2007, he must

establish disability on or before December 31, 2007 to be entitled to DIB. *Id*. at 20; *see Shideler

v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012) ("whatever condition the claimant may be in at his

hearing, the claimant must establish that he was disabled before the expiration of his insured

status … to be eligible for disability insurance benefits").

The ALJ followed the "five-step sequential evaluation process" for determining whether

a claimant is disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v). The five steps are as follows:

> The first step considers whether the applicant is engaging in substantial
> gainful activity. The second step evaluates whether an alleged physical or
> mental impairment is severe, medically determinable, and meets a durational
> requirement. The third step compares the impairment to a list of impairments
> [in 20 C.F.R. Part 404, Subpart P, App. 1] that are considered conclusively
> disabling. If the impairment meets or equals one of the listed impairments,
> then the applicant is considered disabled; if the impairment does not meet or
> equal a listed impairment, then the evaluation continues. The fourth step

assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011) (internal quotation marks omitted); *see also Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). RFC "is defined as 'the most [the claimant] can still do despite [his] limitations.'" *Weatherbee*, 649 F.3d at 569 n.2 (alterations in original) (quoting 20 C.F.R. §§ 404.1545(a), 416.945(a)). "A finding of disability requires an affirmative answer at either step three or step five. The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). At the fifth step, the government "must present evidence establishing that the claimant possesses the [RFC] to perform work that exists in a significant quantity in the national economy." *Weatherbee*, 649 F.3d at 569 (footnote omitted).

Here, the ALJ determined that Daniels previously engaged in "substantial gainful activity" but had not done so since the alleged onset date (step one); that Daniels suffered from the severe impairments of lumbar degenerative disc disease and depression (step two); and that neither impairment was listed or equal to a listing in 20 C.F.R. Part 404, Subpart P, App. 1 (step three). Doc. 9-10 at 22-25. Daniels does not challenge the ALJ's rulings at any of these steps. As part of step four, the ALJ determined that Daniels had the RFC to perform "light work," explaining as follows:

After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he could not climb ladders, ropes, or scaffolding. He could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. He would have needed a sit/stand option

> that allowed him to change positions every 30 minutes for 5 minutes at a time. He was limited to work involving simple instructions, routine tasks, no interaction with the public, and only occasional interaction with coworkers.

*Id*. at 25. Given this conclusion, the ALJ found that Daniels was unable to perform his past work as a laborer and as a warehouse worker/forklift operator. *Id*. at 29-30.

At step five, however, the ALJ concluded that Daniels was capable of performing other jobs that were available in significant numbers in the Chicago metropolitan area. *Id*. at 30-31. In particular, the ALJ found, based on the VE's testimony, that an individual with Daniels's RFC could work as a hand packer, assembler, or hand sorter. *Id*. at 30. Having determined that jobs existed for an individual with Daniels's RFC, the ALJ concluded that Daniels was not disabled under the Social Security Act and thus was ineligible for DIB. *Id*. at 31. Details of the ALJ's opinion are set forth and addressed below.

## Discussion

A claimant is disabled under the Social Security Act if he is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant will prevail if his impairments prevent him from performing his prior employment and any other job generally available in the national economy. *See id*. § 423(d)(2)(A). As noted above, because Daniels did not file written exceptions and the Social Security Appeals Council did not review the ALJ's decision on its own, the ALJ's decision became the Commissioner's final decision. Doc. 9-10 at 18.

Section 405 of the Act authorizes judicial review of the Commissioner's final decision. *See* 42 U.S.C. § 405(g). The court reviews the Commissioner's legal determinations *de novo* and

her factual findings deferentially, affirming those findings so long as they are supported by substantial evidence. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"; it "must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (internal quotation marks omitted). If the reviewing court finds that the Commissioner's decision is not supported by substantial evidence, "a remand for further proceedings is [usually] the appropriate remedy." *Briscoe*, 425 F.3d at 355. Moreover, the court "cannot uphold an administrative decision that fails to mention highly pertinent evidence," *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), or a decision containing errors of law, *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

In addition to satisfying these standards, the Commissioner's opinion must build an "accurate and logical bridge from the evidence to [the] conclusion so that [the] reviewing court[] may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (internal quotation marks omitted); *see also Briscoe*, 425 F.3d at 351 ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (holding that the ALJ must "articulate at some minimal level her analysis of the evidence to permit an informed review") (internal quotation marks omitted). To build a logical bridge, the Commissioner must "sufficiently articulate his assessment of the evidence to assure [the court] that he considered the important evidence … and to enable [the court] to trace the path of his

reasoning." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (internal quotation marks and brackets omitted). The court "cannot uphold a decision by an administrative agency … if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

Daniels argues that the Commissioner's decision erred in five respects: (1) by failing to properly base the mental health analysis on a professional assessment; (2) by improperly finding certain non-exertional limitations; (3) by improperly discounting the medical opinion of Daniels's treating physician, Dr. DePhillips; (4) by failing to adequately support an adverse credibility determination against Daniels; and (5) by failing to consider all relevant evidence when rendering the RFC determination. Because the court agrees with the third and fourth contentions, remand is necessary.

### A.     The Mental Health Analysis

The Seventh Circuit described the "special technique" for evaluating mental health limitations, established by 20 C.F.R. § 404.1520a, as follows:

> Under this so-called "special technique," the ALJ must, in determining whether the claimant has a severe impairment (step two of the five-step analysis), rate the degree of the functional limitation resulting from the claimant's impairment with respect to four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The ALJ must rate the claimant's limitation in the first three categories as none, mild, moderate, marked, or extreme, and number the claimant's episodes of decompensation. *Id*. § 404.1520a(c)(4). If there are no episodes of decompensation and the rating in each of the first three categories is none or mild, the impairment generally is not considered severe and the claimant thus is not disabled. *Id*. § 404.1520a(d)(1). Otherwise, the impairment is classified as severe, and the ALJ continues on to steps three through five of the standard five-step analysis. *Id*. § 404.1520a(d)(2). ALJs formerly were required to enter this information on a standard document known as a Psychiatric Review Technique Form ("PRTF") and append it to their decision,

see *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003), but now they
need only incorporate into their decision the pertinent findings and
conclusions based on the technique, *see* 20 C.F.R. § 404.1520a(e)(2).

*Richards v. Astrue*, 370 F. App'x 727, 730 (7th Cir. 2010); *see also Craft v. Astrue*, 539 F.3d

668, 674-75 (7th Cir. 2008).

Daniels contends that the ALJ failed to properly rely on a mental health specialist in

finding that he had "mild restrictions in activities of daily living, moderate difficulties in social

functioning and no difficulties with concentration, persistence or pace." Doc. 18 at 10. Daniels

notes that Dr. Kirk Boyenga provided the only PRTF, which determined that between February

12, 2007 and March 31, 2007, there was "insufficient evidence" to evaluate Daniels's

depression. *Ibid.*; *see* Doc. 9-9 at 15. The ALJ ultimately relied on Dr. Sherman's progress

notes to assess the effect of Daniels's depression on his daily activities, social functioning, and

concentration, persistence, or pace. Doc. 9-10 at 23-25. The ALJ's failure to rely on a

conclusive PRTF is not fatal; as the Seventh Circuit has explained, "there is no absolute

requirement that an ALJ remand a case simply because a PRTF was not completed at the initial

or reconsideration level." *Richards*, 370 F. App'x at 731.

Daniels cites *Richards* for the proposition that an ALJ "may not draw conclusions based

on an undeveloped record and has a duty to solicit additional information to flesh out an opinion

for which the medical support is not readily discernable." *Ibid.* (internal quotation marks

omitted); *see* Doc. 18 at 10. In this respect, Daniels maintains that "the ALJ should have

recontacted Dr. Sherman for a functional assessment or sent a medical doctor for a consultative

examination." Doc. 28 at 2. *Richards* is distinguishable, however. In *Richards*, the Seventh

Circuit remanded due to the ALJ's failure to use the special technique, reasoning that the "ALJ

nowhere mentioned that she was applying the technique, … happened to assign [the plaintiff] a

rating in each of the four functional categories … at step three of her five-step analysis (not at step two, as the technique requires)[,] and did not explain how she had reached her conclusions." 370 F. App'x at 730. The court was "[m]ost significantly … troubled that the ALJ rated [the plaintiff's] mental functional limitations without the benefit of any medical professional's assessment of her mental RFC." *Ibid*.

Unlike the ALJ in *Richards*, who did not rely on any medical professional's assessment and failed to explain how she reached her conclusions, the ALJ here relied on Dr. Sherman's treatment notes and explained how those notes reasonably guided her in reaching her conclusions. Doc. 9-10 at 23. Although the ALJ here did not mention that she was applying the special technique and applied the technique at the third step instead of the second step, Daniels does not argue that the ALJ did not actually apply the technique or that any prejudice arose from the application of the technique at step three. Thus, Daniels's first ground for remand is without merit.

### B.        The RFC Determination With Respect To Non-Exertional Limitations

Next, Daniels argues that the ALJ "erred in finding" as part of the RFC determination that he "was allowed no interaction with the public but could occasionally interact with coworkers" because "[t]he ALJ's decision does not explain why, given the evidence, Mr. Daniel[s]'s anger/irritability would only preclude interaction with the public, and would not cause limits in dealing with supervisors, and greater limits in dealing with cow[o]rkers." Doc. 18 at 11-12. Daniels adds that "[t]he ALJ has not shown how she concluded that … [Daniels's] activities of daily living, social functioning[,] or concentration[,] persistence[,] or pace support a finding that he can function in a work setting involving simple instructions [and] routine tasks." *Id*. at 12.

Daniels is wrong, as the ALJ's analysis of his non-exertional limitations builds "an accurate and logical bridge" between the evidence and the ALJ's conclusions. The ALJ considered Daniels's treatment history with Dr. Sherman and reviewed her progress notes reporting that Daniels was anxious and irritable. Doc. 9-10 at 27. The ALJ noted that while Daniels "reported that he did not spend time with others," "got angry at neighbors when they mowed the lawn or made noise," and "did not want to leave his house and … would stay in his room," he also testified that "he was never … fired or disciplined at a job for anger problems." *Id*. at 23-24. The ALJ added that Dr. Sherman's notes "showed that [Daniels] had a positive response to medication throughout 2007" and that by 2008, Daniels "indicated that he was not depressed, but was bored." *Id*. at 27. Based on these observations, the ALJ reached the following conclusion: "It appears that irritability was one of the claimant's biggest problems. As a result, I restricted the claimant to no interaction with the public and only occasional interaction with coworkers. I further limited him to work involving only simple instructions and routine tasks. I did this as difficult tasks might cause frustration and irritability for the claimant. My limitation to simple instructions and routine tasks was also done in order to accommodate the claimant's pain complaints." *Ibid*.

The ALJ's analysis of the evidence suffices to "assure [the court] that [the ALJ] considered the important evidence" and enables the court to "trace the path of [her] reasoning" in imposing non-exertional restrictions on Daniels's social interactions and work assignments. *Hickman*, 187 F.3d at 689 (internal quotation marks omitted); *see also Zurawski*, 245 F.3d at 888 (requiring the ALJ to "articulate at some minimal level her analysis of the evidence to permit an informed review") (internal quotation marks omitted). Accordingly, Daniels's second ground for remand is rejected.

## C.     The Weight Afforded Medical Opinions

Generally, the ALJ must give "controlling weight" to the medical opinion of a treating physician "if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.'" *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). An ALJ must offer "good reasons" for discounting a treating physician's opinion. *Larson*, 615 F.3d at 749 (internal quotation marks omitted). Put another way, "[e]ven though the ALJ was not required to give [the treating physician's] opinion controlling weight, [the ALJ] was required to provide a sound explanation for his decision to reject it and instead adopt [the state agency physician's] view." *Roddy*, 705 F.3d at 636 (citations omitted).

In reaching her RFC conclusion, the ALJ did not give controlling weight to Dr. DePhillips's opinion, reasoning:

> Dr. DePhillips made numerous opinions that the claimant should be off work until his next appointment and marked him as totally incapacitated. (Ex.'s 2F, 12, 17F). I do not assign these opinions controlling or great weight. I appreciate that Dr. DePhillips was the claimant's treating neurologist. However, Dr. DePhillips'[s] opinions were conclusory, on issues reserved to the Commissioner, and not supported by Dr. DePhillips['s] own treatment records.

Doc. 9-10 at 28. The ALJ recognized that "[t]he record also contains opinions rendered by Dr. Arti Chawla and Aubrey Linder, a physician's assistant, who saw the claimant shortly after he injured his back and instructed him to stay off work (Exhibits 2F, 3F)," but the ALJ discounted those opinions on the ground that they "appear to be short-term opinions and moreover, are not supported by subsequent examination and MRI findings." *Id.* at 28-29. Daniels contends that

the ALJ erred in failing to assign Dr. DePhillips's opinion controlling weight. Doc. 18 at 13. None of the ALJ's explanations as to Dr. DePhillips qualify as "good reasons" for discounting his opinion in favor of the view of the state agency physician, Dr. Free.

As an initial matter, the Commissioner's brief incorrectly understands Daniels to be arguing that "the ALJ should have adopted the opinion of his treating physician Dr. DePhillips that he could not work." Doc. 26 at 6. Daniels is not arguing that the ALJ should have concluded that Daniels was disabled based solely on his treating physician's opinion that Daniels was disabled. Indeed, settled law holds that a treating physician's opinion that a claimant is disabled "is not conclusive on the ultimate issue of disability, which is reserved to the Commissioner." *Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002); *see also Richison v. Astrue*, 462 F. App'x 622, 625 (7th Cir. 2012) ("as for [the treating physician's] opinion that Richison was 'disabled,' the ALJ correctly labeled that as an ultimate determination reserved to the Commissioner"). Rather, Daniels argues that the ALJ should not have discounted Dr. DePhillips's non-conclusory opinions as to his condition—opinions that served as the basis for Dr. DePhillips's ultimate determination that he was disabled.

"A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). However, an "ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician, or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." *Ibid.* (citations, internal quotation marks, and brackets omitted); *see also Richison*,

462 F. App'x at 625; *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000).

Although the ALJ discounted DePhillips's opinions in part on the ground that they were "not supported by Dr. DePhillips['s] own treatment records," the ALJ did not adequately articulate how Dr. DePhillips's treatment records were inconsistent either with Dr. Free's findings or internally. Doc. 9-10 at 28. The ALJ provided the following explanation for favoring Dr. Free's opinion over that of Dr. DePhillips:

> I note that Dr. Free considered the claimant's February 2007 MRI study (Exhibit 13F/8). The claimant had another MRI (which Dr. Free did not consider) in September 2008, but Dr. DePhillips noted that this MRI showed "no significant change" when compared to the earlier study (Exhibit 17F/3). Also, DePhillips documented the claimant's decreased but symmetrical ankle reflexes and good motor strength (Exhibit 2F/14). Dr. DePhillips did not report examination findings at subsequent visits with the claimant during the period at issue here (Exhibits 11F, 17F). Dr. DePhillips subsequently referred the claimant to Dr. John Shea, a neurologist, for an independent examination …. Upon examination, Dr. Shea reported that the claimant essentially had loss of sensation over the entire left side of his body, which would be unrelated to any disc problems in the lower back or neck. Dr. Shea commented that the claimant had normal reflexes with give-way weakness, no atrophy, and no objective abnormalities. Dr. Shea concluded that the claimant did not need surgery or further treatment. Thus, in light of this evidence, I have restricted the claimant to light work involving no climbing ladders, ropes, or scaffolds, and only occasional crawling, stooping, and climbing ramps and stairs. This finding is consistent with the opinion rendered by Dr. Free; I have given great weight to this opinion.

*Ibid*. While the ALJ suggested that some of Dr. DePhillips's assessments were inconsistent with his conclusion that Daniels was disabled, the ALJ did not explain how this is so. Dr. DePhillips's observation that the September 2008 MRI scan showed "no significant change" from the July 2007 MRI scan does not by itself preclude a finding that Daniels had a disabling condition. Perhaps it would have been different if Dr. DePhillips had found no evidence of injury from the 2007 MRI scan; however, Dr. DePhillips observed that the 2007 MRI scan

revealed "severe disc degeneration with disc space collapse and narrowing at the L5-S1 level" and attributed the pain in Daniels's back to the disc injury at the L5-S1 level.  Doc. 9-8 at 97-98. The fact that Daniels's 2008 MRI scan showed "no significant change" since the 2007 MRI scan merely indicates that the same sources of pain that were present in 2007 carried over into 2008, and could certainly support Dr. DePhillips's conclusion that Daniels was disabled in 2007.

Likewise, the ALJ's statement that Dr. DePhillips observed that Daniels had "decreased but symmetrical ankle reflexes and good motor strength" does not explain the relevance of this fact or why it undermines the reliability of Dr. DePhillips opinions.  The ALJ's explanation does not acknowledge that Dr. DePhillips consistently observed that Daniels suffered from severe lower back pain.  Doc. 9-9 at 46.  Did the ALJ believe that symmetrical ankle reflexes and good motor strength could not support a claim for disability, even when coupled with severe lower back pain?  It is impossible to tell from the opinion, which prevents meaningful judicial review. *See Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011) (holding that the ALJ's statement that the claimant's medical history was "not necessarily consistent with his allegations of disability" did not give the court any way to review the opinion).

"Even if an ALJ gives good reasons for not giving controlling weight to a treating physician's opinion, she has to decide what weight to give that opinion."  *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010).  "The applicable regulations guide that decision by identifying several factors that an ALJ must consider: 'the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion.'"  *Ibid.* (quoting *Larson*, 615 F.3d at 751); *see also Roddy*, 705 F.3d at 637 (noting that Social Security regulations provide that "more weight should be given to the opinions of doctors who have (1) examined a

claimant, (2) treated a claimant frequently and for an extended period of time, (3) specialized in treating the claimant's condition, (4) performed appropriate diagnostic tests on the claimant, [and] (5) offered opinions that are consistent with the objective medical evidence and the record as a whole") (citing 20 C.F.R. § 404.1527(c)(2)(i), (ii)). The Seventh Circuit has repeatedly criticized ALJ decisions that discount the treating physician's opinion but say nothing regarding these factors. *See*, *e.g.*, *Mueller v. Astrue*, 493 F. App'x 772, 776-77 (7th Cir. 2012) ("If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion.") (internal quotation marks omitted); *Campbell*, 627 F.3d at 308; *Larson*, 615 F.3d at 751; *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (holding that if the treating physician's opinion is not given controlling weight, "the checklist comes into play").

Several of the above-referenced factors support the conclusion that Dr. DePhillips's opinions should be given substantial, if not controlling, weight. Dr. DePhillips had a relationship with Daniels spanning more than a year and treated him every one to three months, unlike Dr. Shea and Dr. Free, who each saw Daniels only once. Doc. 9-8 at 97-98; Doc. 9-9 at 45-46, 78, 82, 84, 86, 88-89. Dr. DePhillips was a neurologist and offered opinions that were consistent throughout the course of Daniels's treatment. *Ibid*. Dr. DePhillips routinely observed that Daniels suffered from severe lower back pain radiating into his lower extremities and noted that his pain had failed to improve with physical therapy and spinal steroid injections. Doc. 9-9 at 45-46, 89. Throughout the course of treatment, Dr. DePhillips maintained that Daniels was to remain off work. Doc. 9-8 at 98; Doc. 9-9 at 79, 82, 86, 101-08, 118.

"Proper consideration of these factors may have caused the ALJ to accord greater weight to Dr. [DePhillips's] opinion[s]." *Campbell*, 627 F.3d at 308 (holding that where the treatment lasted fifteen months, the treating physician's findings remained relatively consistent, and the treating physician practiced in the relevant medical specialty, the treating physician's opinion "should be given great weight"). In crediting Dr. Free's opinion over Dr. DePhillips's opinion, the ALJ noted that Dr. Shea's findings—that Daniels's loss of sensation was "unrelated to any disc problems in the lower back or neck," that Daniels had normal reflexes and no objective abnormalities, and that he did not need surgery or further treatment—were "consistent with the opinion rendered by Dr. Free." Doc. 9-10 at 28. But the ALJ did not explicitly address the above-referenced factors in discounting Dr. DePhillips's opinions, warranting a remand. *See Mueller*, 493 F. App'x at 776-77 (holding that remand was necessary in part because "[t]he record contains nothing indicating that the ALJ considered any of these factors"); *Larson*, 615 F.3d at 751 (same, where "the ALJ said nothing regarding this required checklist of factors"); *Santoro v. Astrue*, 2011 WL 528257, at *9 (N.D. Ill. Feb. 7, 2011) ("To the extent the ALJ's decision does not explicitly address the checklist of factors as applied to the medical opinion evidence, it must be reversed for further analysis.") (internal quotation marks omitted); *Smith v. Comm'r of Soc. Sec.*, 2010 WL 1838366, at *10 (N.D. Ind. May 6, 2010) (same).

The ALJ's reliance on the opinion of a non-examining state agency doctor who reviewed only part of Daniels's records further undermines the ALJ's decision. Dr. Free stated that in making his report on February 19, 2008, he reviewed only the February 2007 MRI scan, Dr. Chawla's notes in February 2007, and progress reports from the Joliet Pain Care Center between March and April 2007. Doc. 9-9 at 55. Nowhere did Dr. Free mention that he reviewed Dr. DePhillips's extensive treatment notes spanning from July 2007 to October 2008. The Seventh

Circuit has cautioned that where state agency doctors do not have the opportunity to review subsequent treatment records, their opinions may be entitled to less weight because the new information "would affect the state agency reviewers' assessment of" the claimant's health. *Campbell*, 627 F.3d at 309; *see also Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("[T]he ALJ would be hard-pressed to justify casting aside Dr. Radzeviciene's opinion in favor of these earlier state-agency opinions. By 2008, the state-agency opinions were two years old. Dr. Radzeviciene's opinion, on the other hand, was the most recent professional word on Jelinek's mental impairments, by a treating psychiatrist who had seen her repeatedly over a two-year period with full access to her complete medical record to that point.") (citation omitted).

Aside from noting that Dr. Free's opinions were consistent with Dr. Shea's, the ALJ did not explain why Dr. Free's opinions should be accorded more weight than Dr. DePhillips's. *See Santoro*, 2011 WL 528257, at *9 (holding that reliance on the opinions of several state agency doctors who never treated the claimant or only briefly treated him was inappropriate absent an explanation of why the state doctors' medical conclusions were "more reliable than the opinions proffered by" the treating physician). Moreover, the record shows that Dr. DePhillips disagreed with Dr. Shea's opinion that Daniels's pain resulted from a muscle sprain and that no further treatment was necessary. Dr. DePhillips explained the basis for his disagreement as follows: "In light of the fact that Mr. Daniels has a history of a fusion at the L5-S1 level which appears to have been aggravated by the injury and in light of the fact that there may be other levels of internal disc disruption L3-L4 and L4-L5, it seems ludicrous to attribute his pain to a muscle sprain which should have improved within 2-3 months of the accident." Doc. 9-9 at 89. The ALJ did not acknowledge Dr. DePhillips's disagreement with Dr. Shea or explain why Dr. DePhillips's opinions should nevertheless be discounted.

Because the ALJ did not adequately address why Dr. Free's and Dr. Shea's opinions were entitled to greater weight than Dr. DePhillips's opinion, reliance upon their opinions was inappropriate.  *See Moss*, 555 F.3d at 561 (an ALJ cannot "accept one physician's opinions but not the other's … without any consideration of the factors outlined in the regulations, such as the differing specialties of the two doctors [and] the additional diagnostic testing conducted by [the treating doctor]"); *Collins v. Astrue*, 324 F. App'x 516, 521 (7th Cir. 2009) (citing *Moss* for the proposition that an "ALJ's decision to accept one physician's opinion over another's without any consideration of the factors outlined in the regulations is reason for reversal").  The ALJ's RFC determination cannot be sustained for these reasons, and remand is warranted on this ground alone.  *See Bjornson v. Astrue*, 671 F.3d 640, 649 (7th Cir. 2012); *Scott*, 647 F.3d at 740; *Martinez*, 630 F.3d at 697-99.

### D.     The Adverse Credibility Determination

Daniels also challenges the ALJ's adverse credibility determination.  Doc. 18 at 15.  An ALJ's credibility determination is "entitled to special deference because the ALJ is in a better position than the reviewing court to observe a witness."  *Briscoe*, 425 F.3d at 354.  A reviewing court may "overturn a credibility determination only if it is patently wrong," *Craft*, 539 F.3d at 678, or if the ALJ fails to "justif[y] her conclusions with reasons that are supported by the record," *Richards*, 370 F. App'x at 731; *see also Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).  To build the required logical bridge for a credibility determination, the ALJ must consider not only the objective medical evidence, but also the claimant's daily activity; the duration, frequency, and intensity of pain; any precipitating and aggravating factors; the dosage, effectiveness, and side effects of medication; and functional restrictions.  SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996); *see also Villano*, 556 F.3d at 562-63 (requiring an analysis of the

factors listed in SSR 96-7p as part of building a logical bridge for credibility determinations).

Moreover, "[u]nder Social Security Ruling 96-7p, an ALJ's evaluation of a[n] applicant's credibility must be specific enough to make clear to [the court] how much weight the ALJ gave to the applicant's testimony and the reasons for that decision." *Hill v. Astrue*, 295 F. App'x 77, 81 (7th Cir. 2008); *see also Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("[T]he ALJ must consider the claimant's level of pain, medication, treatment, daily activities, and limitations, 20 C.F.R. § 404.1529(c), and must justify the credibility finding with specific reasons supported by the record."); *Villano*, 556 F.3d at 562-63; *Ribaudo v. Barnhart*, 458 F.3d 580, 584-85 (7th Cir. 2006); *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003).

The ALJ's first ground for discrediting Daniels's testimony is as follows:

> The claimant testified that, during the period at issue, he stayed in bed 2/3 of the day and was like a hermit. However, he did not report this to Dr. Sherman until early 2009, a time when he was drinking again and got another DUI (Exhibit 19F/6, 7). He testified that he was a hermit, but he also went out to the woods with his neighbor about once a week. I also observed at the hearing that the claimant was missing the tip of his right ring finger. When I inquired about this, the claimant stated that the accident that caused this happened about two and a half years ago (which would have been around late 2009 to early 2010[], when he was working on his motorcycle in his garage. This activity is not consistent with his significant depression and inability to be out of bed more than 1/3 of the day.

Doc. 9-10 at 29. Daniels argues that "[w]hile the ALJ did list activities, they were fairly restricted and did not undermine or contradict disabling pain." Doc. 18 at 15. The court agrees, as those minimal activities—going to the woods once a week and working on a motorcycle in the garage—are not inconsistent with Daniels's assertion that he was a hermit who stayed in bed for most of the day, and nor do they contradict claims of depression and disabling pain. *See Ramey v. Astrue*, 319 F. App'x 426, 429-30 (7th Cir. 2009) (holding that the claimant's activities of vacuuming, sweeping, driving, doing laundry every four days, grocery shopping every two

weeks, and going to church once a week were not inconsistent with the claimant's allegation that she slept most of the day and experienced severe pain rated at a nine out of ten, reasoning that "[the claimant's] activities are minimal and should not have formed a basis for the ALJ's adverse credibility determination"); *Zurawski*, 245 F.3d at 887 (noting that the claimant's daily activities of washing dishes, helping his children prepare for school, doing laundry, and preparing dinner were "not of a sort that necessarily undermines or contradicts a claim of disabling pain"); *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004) (same, where the claimant's physical activities consisted of grocery shopping, walking for an hour in the mall, getting together with friends, playing cards, swimming, watching television, and reading, noting that those activities "did not consume a *substantial part* of [her] day" and that "activities such as walking in the mall and swimming are not necessarily transferable to the work setting with regard to the impact of pain"); *Clifford*, 227 F.3d at 872 (same, where the claimant performed house chores lasting for two hours, cooked simple meals, went grocery shopping three times a month, and sometimes carried groceries from her car to her apartment).

The ALJ's second ground for discrediting Daniels's testimony is as follows:

> The claimant also testified that when he did leave his house to go to the doctor, he was anxious. Yet the claimant's own doctors did not document this anxiety. Moreover, the claimant seemed to have a positive response to his psychiatric medications (Ex.'s 5F/4, 10F/9-11). He had treatment once a month during the relevant time period with no need for more frequent or aggressive treatment. He had minimal complaints of side effects and when he did complain his dosages were adjusted.

Doc. 9-10 at 29. In finding that Daniels was not credible because his anxiety was not documented by his "own doctors," the ALJ overlooked evidence corroborating Daniels's claim of anxiety. Dr. Sherman diagnosed Daniels on June 7, 2007 with "anxious, irritable, major depressive disorder." Doc. 9-8 at 95. Throughout the course of treatment, Dr. Sherman

commented on Daniels's anxiety, noting in late June 2007 that Daniels was "less anxious" after taking Effexor, but that he was "still agitated a lot, though better on Effexor" in October 2007. Doc. 9-9 at 38-39. Moreover, Daniels never claimed that his depression did not improve with medication. To the contrary, he testified in 2012 that his depression had gotten "better because [he has] been seeing a therapist for the last five or six years and she's put [him] on a lot of cocktails." Doc. 9-10 at 53. It was an error to overlook this corroborating evidence in determining Daniels's credibility. *See Ramey*, 319 F. App'x at 429; *Carradine*, 360 F.3d at 755.

Next, the ALJ discredited Daniels's credibility on this ground:

> The claimant also acknowledged at the hearing that he could lift ten pounds, sit fifteen to twenty minutes, stand for 20 minutes and walk one mile. While these abilities do not equate with full-time work at the light level exertion, they do show significant abilities.

Doc. 9-10 at 29. This is an insufficient basis to discredit Daniels, as it does not point to any inconsistency in Daniels's testimony. The ALJ did not spell out what was meant by "significant abilities," and nor did the ALJ assert that Daniels ever claimed that he did not possess "significant abilities."

The ALJ's final ground for discrediting Daniels is as follows:

> I also find that the claimant's allegations are not supported by the objective medical evidence. As for his back complaints, he had conservative treatment. Although Dr. DePhillips thought that the claimant should undergo surgery, two other physicians, Dr. G[h]a[na]yem (Ex. 20F) and Dr. Hurley (Ex. 25F/8) found that the claimant was not a good candidate for surgery. Further, his mental health treatment notes documented his positive response to treatment.

*Ibid*. The record does not support the conclusion that Daniels's "conservative treatment" and lack of surgery undermine the credibility of his complaint of severe back pain. In early 2008, Dr. DePhillips observed that Daniels "failed to improve with conservative treatment" and continued to suffer from lower back pain. Doc. 9-9 at 89. As a result, Dr. DePhillips prescribed two new

pain medications and was seriously considering surgery to alleviate Daniels's pain.  *Id*. at 80, 86, 88.  Around that time, Dr. DePhillips reviewed Dr. Shea's conflicting opinion that Daniels's symptoms were related to a lumbar sprain and that no further treatment was required.  *Id*. at 96.  Instead of flatly rejecting Dr. Shea's evaluation, Dr. DePhillips ordered a discogram to determine whether the pain was stemming from a spinal injury or simply a muscle injury.  *Id*. at 88.  When the discogram was inconclusive, Dr. DePhillips sought a second opinion from Dr. Hurley, an independent spine surgeon, as to whether to proceed with surgery.  *Id*. at 80.  Dr. Hurley felt that surgery was inappropriate, not because Daniels did not suffer from back pain, but because "the risks of surgery outweigh[ed] the benefits."  *Id*. at 78.  In fact, Dr. Hurley recommended "other treatment modalities for the pain and possible spinal cord stimulator."  Doc. 9-15 at 78.  Upon receiving Dr. Hurley's recommendation, Dr. DePhillips did not feel comfortable proceeding with surgery, but maintained that "it [would be] reasonable to proceed with a spinal fusion L2-S1 provided that Mr. Daniels has a reasonable expectation in terms of outcome and that there is a 50% chance that his symptoms will not improve or even worsen after the surgery."  Doc. 9-9 at 78.  Like Dr. Hurley, Dr. Ghanayem counseled against surgery, but not because Daniels did not have back pain.  *Id*. at 135.  Dr. Ghanayem explicitly recognized that Daniels's discograms reflected lower back pain and recommended that Daniels "see one of [the hospital's] chronic pain/comprehensive pain programs."  *Ibid*.  Thus, the record clearly shows that Dr. DePhillips, Dr. Ghanayem, and Dr. Hurley all believed that Daniels suffered from lower back pain that warranted further treatment, despite their consensus that surgery was inappropriate.

Additionally, it is not inconsistent for Daniels to assert that he suffered from mental health issues in 2007 while his treatment notes reflected an improvement in his mental health that year.  Although Dr. Sherman noted that Daniels's symptoms had improved after taking

depression medication, she continued to observe that he struggled with anxiety and irritability. *Id.* at 37-39. And even when Dr. Sherman believed that Daniels's depression was in remission in November and December 2007, she still recommended that he continue taking his depression medication. *Id.* at 37.

On remand, the ALJ should reassess Daniels's credibility in light of all the evidence in the record. *See Terry*, 580 F.3d at 478 (remanding where the ALJ's adverse credibility determination was not supported by the record); *Ribaudo*, 458 F.3d at 584-85 (same).

### E.    The RFC Determination With Respect To Physical Limitations

As the Commissioner's brief notes, "[w]hen assessing Daniels's physical RFC, the ALJ relied on the opinions of Dr. Free and Dr. Shea" and not those of Dr. DePhillips or Daniels's testimony. Doc. 26 at 10. The ALJ's reconsideration of Daniels's credibility and Dr. DePhillips's opinions on remand likely will affect the RFC determination. It therefore is unnecessary to consider Daniels's argument that the ALJ failed to consider all relevant evidence, including Dr. DePhillips's opinions and Daniels's testimony, in determining his physical RFC. *See Hudson v. Astrue*, 2009 WL 2612528, at *14 n.6 (N.D. Ill. Aug. 24, 2009) ("In light of this remand order [to reassess an RFC determination], we find it unnecessary to address the other arguments that plaintiff has raised. On remand, the ALJ will be free to re-examine and reassess those points, including … his credibility decisions in determining plaintiff's RFC.").

### Conclusion

For the foregoing reasons, the court remands the case to the Commissioner for further proceedings consistent with this opinion.

May 23, 2014

_____
United States District Judge